UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| NAEEMAH DILLARD,<br>　　　　　　　　Plaintiff,<br><br>v.<br><br>CANAL STREET BREWING<br>CO., L.L.C. et al.,<br>　　　　　　　　Defendants. | Case No. 23-11019<br>Honorable Shalina D. Kumar<br>Magistrate Judge Anthony P. Patti |

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO COMPEL (ECF NO. 18) AND STAYING CASE PENDING ARBITRATION**

## I.　Introduction

Plaintiff Naeemah Dillard brings this action alleging racial discrimination, harassment, and retaliation by her former employer, defendant Canal Street Brewing Co. d/b/a Founders Brewing Company ("Founders").[1] ECF No. 16. Founders filed a motion to compel arbitration and stay this case. ECF No. 18. Dillard opposes the motion, maintaining that she did not agree to arbitrate any claims against Founders when electronically signing her new employee onboarding documents. After finding a genuine dispute of fact over whether Dillard agreed to arbitration,

---

[1] "Founders" as used throughout this opinion and order also includes moving defendant Spain's Best Beers, Inc.

the Court held a summary bench trial under 9 U.S.C. § 4. *See* ECF Nos. 23, 26, 34.

## II. Findings of Fact

1. Dillard accepted Founders' offer of employment at its Detroit taproom on June 7, 2021. ECF No. 36-8.

2. Founders' employees cannot be placed on the payroll or paid until they complete the onboarding process through Paycor, Founders' human resource management and payroll provider. ECF No. 35, PageID.1035.

3. Founders notified Dillard that she would receive an email from Paycor and instructed her to complete the Paycor onboarding process prior to her June 14, 2021 new hire orientation. ECF No. 36-6.

4. Dillard received the email from Paycor on June 11, 2021. ECF No. 35, PageID.1057.

5. Dillard completed the first step of the onboarding process by creating a username and password. ECF No. 35, PageID.1036, 1123; ECF No. 36-19, PageID.1232.

6. Paycor instructs the new employee to log back into Paycor using the newly created username and password. The employee then

verifies her personal and contact information and completes an I-9 verification and tax forms. *Id.* at PageID.1037.

7. The next portion of the onboarding process requires the employee to sign Founders' various employment agreements. These include: (1) the Confidentiality Agreement; (2) an employee handbook acknowledgement; (3) a consent to receive electronic communications form; (4) a key fob acceptance form; and (5) a photo, video, and audio authorization form. *Id.* at 1033; ECF Nos. 36-1 – 36-5.

8. Before accessing the Founders' agreements, Paycor requires the employee to set up an electronic signature. As part of this process, the employee "acknowledge[s] that [she] ha[s] read and understand[s] that the signatures [she] provide[s] on these documents constitutes an electronic, binding representation for the purpose of legal documents and contracts." ECF No. 35, PageID.1045; ECF No. 36-10.

9. Only once an employee sets up her electronic signature and acknowledges that it will be binding does she gain access to the Founders' employment agreements requiring signature. ECF No. 35, PageID.1050.

10. Dillard does not dispute that she set up her electronic signature and acknowledged that her electronic signature is binding. *See* ECF No. 38, PageID.1281.

11. Dillard attempted to complete the onboarding paperwork on her mobile phone on the morning of her orientation, June 14, 2021. *Id*. at PageID.1123.

12. Adam Geyer ("Geyer"), Founders' HR Business Partner, emailed Dillard during orientation, noting that she had not completed the Paycor onboarding process and offering to assist her.

13. Dillard informed Geyer that she did not complete the Paycor onboarding process before the orientation because she had encountered an error which prevented her from completing the tax forms or continuing to next steps. She noted that she would try again. ECF No. 35, PageID.1128; ECF No. 36-6, PageID.1175.

14. Geyer was aware that others had experienced such an error at the tax forms step when attempting to complete the onboarding process from a mobile device, and he had advised others to try to complete the process using a computer. *Id*. at PageID.1059.

15. Geyer did not advise Dillard to try to complete the process from a computer. *Id*. at PageID.1086-87.

16. Apparently recognizing that a computer would allow her to complete the process, Dillard responded to a follow-up email from Geyer that she would not have access to a computer until the next day but would keep trying on her phone. ECF No. 36-6, PageID.1177.

17. A few minutes later, Dillard emailed Geyer to report that she was still receiving an error message but that she was now able to continue the process if she waited for the error message to leave the screen. She indicated that she could now progress past the tax forms and that she would continue with the next steps of the process. *Id*.

18. Seven minutes later, at 10:01 pm, she emailed Geyer that she had completed the onboarding process. *Id*. at PageID.1178.

19. Geyer received an email from Paycor at 9:59 pm indicating that Dillard had completed her onboarding package. ECF No. 36-7.

20. Each of the five Founders' employment agreements reflect that they were signed electronically by Dillard between 9:56 and 9:58 pm on June 14, 2021. ECF No. 36-1 – 36-5.

21. The arbitration agreement is labeled as such in a heading for paragraph C of the Confidentiality Agreement, one of the

Founders' employment agreements electronically signed by Dillard as part of the Paycor onboarding process. ECF No. 36-1, PageID.1166.

22. Paragraph C and its heading, "Arbitration Agreement," appear near the center of the screen when the Confidentiality Agreement is opened for review and signature during the onboarding process. ECF No. 36-11.[2]

23. Also visible on the screen displaying the Arbitration Agreement portion of the Confidentiality Agreement, directly above the box for signature, is a block of text confirming that the signor has "carefully reviewed this document and any information provided by [signor] is true, accurate, and complete. Furthermore, [signor] understand[s] that by signing this form, [she is] agreeing that it represents [her] legally binding signature." *Id*.

24. Dillard does not contest that she took the actions necessary to add her signature to the onboarding documents, i.e., clicking the sign

---

[2] This trial exhibit, a screenshot from Geyer's mobile phone, depicts the Confidentiality Agreement as it appeared in the onboarding process in 2024. Dillard testified that it looked very similar to what she viewed in 2021. ECF No. 35, PageID.1124.

(or accept) and continue button. *See* ECF No. 35, PageID.1124, 1132, 1143.

25. Dillard's trial testimony that she could see only blank screens when reviewing and signing the Confidentiality Agreement, and the other Founders' employment agreements presented as part of the Paycor onboarding process, is not credible. *See* ECF No. 35, PageID.1123-51.

26. Dillard's contemporaneous emails to Geyer regarding her difficulty in completing the onboarding process on June 14th refer to error messages and an inability to advance through all the steps; they do not mention blank screens. ECF No. 36-6.

27. Neither of Dillard's two affidavits indicate that the documents she electronically signed to complete the onboarding process on June 14, 2021 were blank. ECF No. 36-15; ECF No. 36-16.

28. To the contrary, Dillard's second affidavit states that she "was view (sic) some documents on Paycor, but received an error message each time [she] tried to finish one." ECF No. 36-16, PageID.1217, ¶ 6. It also states that she "notified Geyer that [she] was finished with the documents, but received error messages" not that she

completed the process but that all of the documents she was prompted to sign were blank. *Id.* at ¶ 8.

29. Dillard did not report to Geyer or anyone at Founders that the documents presented to her to sign as part of the onboarding process were blank. ECF No. 35, PageID.1143-44.

30. Dillard's personal text: "I hate this part because I'm like omg what if I signed and can't remember lol" acknowledges a possibility that Dillard signed the document containing the arbitration agreement, a possibility which would not exist if only blank documents had been accepted and executed during the onboarding process. ECF No. 36-18.

31. Although Dillard maintains that all the Founders' employment agreements presented to her as part of the Paycor onboarding process were blank, she only denies signing the Confidentiality Agreement, the one containing the arbitration agreement. ECF No. 35, PageID.1124, 1150.

### III.    Conclusions of Law

"[W]hen asked to compel arbitration under a contract, a court determines whether the parties agreed to arbitrate their dispute." *Swiger v. Rosette*, 989 F.3d 501, 505 (6th Cir. 2021). Founders, as the party seeking

to enforce the arbitration agreement, must prove the agreement's existence by the preponderance of the evidence. *Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795, 798 (6th Cir. 2023); *Bank of America, N.A. v. First American Title Ins. Co.*, 878 N.W.2d 816, 829 (Mich. 2016). Courts use the ordinary principles of the applicable state law governing the formation of contracts to assess the existence of a valid arbitration agreement. *Id.*; *see also GGNSC Louisville Hillcreek, LLC v. Estate of Bramer*, 932 F.3d 480, 485 (6th Cir. 2019) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Under Michigan law, "[a] valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *In re StockX Customer Data Breach Litigation,* 19 F.4th 873, 881 (6th Cir. 2021) (citing *AFT Mich. v. State*, 866 N.W.2d 782, 804 (Mich. 2015)). The parties agree that mutual assent to the arbitration agreement is the only element at issue here.

Dillard argues that a meeting of the minds, or mutual assent, was impossible here because she never saw the arbitration agreement. It may be true that Dillard did not know that the Confidentiality Agreement contained an arbitration agreement, but "[a] meeting of the minds is judged

by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Allen v. Michigan State Univ.*, ___ N.W.3d ___, 2024 WL 4982523, at *10 (Mich. Ct. App. Dec. 4, 2024) (quoting *Kloian v. Domino's Pizza LLC*, 733 N.W.2d 766, 771 (Mich. Ct. App. 2006)) (internal quotation marks omitted).

The evidence presented to the Court establishes Dillard's objective assent to the Confidentiality Agreement and the arbitration agreement contained within it. The Confidentiality Agreement bears the indicia of Dillard's electronic signature,[3] a timestamp with her Paycor username. ECF No. 36-1. The electronic signature on the Confidentiality Agreement corresponds with the timestamps for Dillard's electronic signatures on the other Founders' employment agreements, which she does not deny signing. ECF Nos. 36-2 – 36-5; ECF No. 35, PageID.1150. *See, e.g., Townsend v. Pinewood Social, LLC*, 2024 WL 1642790, at *6 (M.D. Tenn. Apr. 16, 2024) (finding fact that employee did not deny signing nine other documents contemporaneously with the arbitration agreement to be compelling evidence that employee signed arbitration agreement). The

---

[3] Because Michigan has adopted the Uniform Electronic Transactions Act, Dillard's electronic signature establishes her acceptance of the agreement in the same way a written signature would. *See Hall v. Pac. Sunwear Stores Corp.*, 2016 WL 1366413, at *5 (E.D. Mich. Apr. 6, 2016).

electronic signature on the Confidentiality Agreement also corresponds with Dillard's 10:01 pm email to Geyer reporting that she completed the onboarding process, which required her to sign certain documents including the Confidentiality Agreement, and the automated Paycor email sent to Geyer at 9:59 pm to confirm Dillard had completed the onboarding process.[4] ECF Nos. 36-7, 36-8. Indeed, Dillard does not contest that she took the actions necessary to add her signature to the onboarding documents, i.e., clicking the sign (or accept) and continue button. See ECF No. 35, PageID.1124, 1132, 1143. Rather, she maintains that clicking the button to electronically sign the documents did not manifest her assent to the Confidentiality Agreement because the document was blank.

    As discussed in detail above, the Court rejects Dillard's trial testimony that the Founders' documents presented to her during the onboarding process were blank. Further, the objective evidence Dillard offers to support her claim that the documents appeared as blank screens when she signed them falls short. Dillard points to the fact that the agreements were

---

[4] Founders also offers a late-produced Paycor audit trail to corroborate the other evidence of Dillard's electronically signing the Confidentiality Agreement. ECF No. 36-14. Dillard objects to the exhibit as not properly authenticated and as inadmissible hearsay. The Court need not determine the admissibility of this evidence because, even if it were admissible, it is duplicative of other admitted evidence and would be superfluous.

signed within a span of only two minutes to establish that the documents presented to her during the onboarding process were blank. But the speed with which Dillard signed the agreements establishes only that she did not read them at the time she signed them.

Dillard's failure to read the Confidentiality Agreement cannot invalidate the arbitration agreement contained within that Agreement. Hornbook law gives a party to a contract the duty to read it before signing it. *StockX*, 19 F.4th at 882 (citing *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 920 (Mich. 1999)); s*ee also Komraus Plumbing & Heating, Inc. v. Cadillac Sands Motel, Inc.,* 195 N.W.2d 865, 868 (Mich. 1972) (internal quotation omitted) ("As in the case of one who signs without reading, it was his duty to [have] examined the contract, to know what he signed, and [the party seeking enforcement] cannot be made to suffer for this neglect on his part.").

Similarly, Michigan law presumes that one who signs an agreement knows the nature of the executed instrument and understands its contents. *McKinstry v. Valley Obstetrics-Gynecology Clinic, P.C.*, 405 N.W.2d 88, 96 (Mich. 1987). A party's "failure to understand a contract's terms constitutes 'negligence which estops [her] from voiding the instrument on the ground that [she] was ignorant of its contents, in the absence of circumstances

fairly excusing [her] failure to inform [herself].'" *Gavette v. United Wholesale Mortgage, LLC*, 2025 WL 318224, at *3 (6th Cir. Jan. 28, 2025) (quoting *Scholz v. Montgomery Ward & Co.*, 468 N.W.2d 845, 848 (Mich. 1991)).

Hence, even if the onboarding documents presented to Dillard were blank, her failure to alert Geyer, or anyone at Founders, that the forms she was being asked to sign were blank, or that she was otherwise unable to read them, breached her duty to inquire about the agreements' indiscernible contents before signing them. *See Scholz*, 468 N.W.2d at 849.

Dillard suggests she signed the purportedly blank documents because Geyer pressured her with repeated emails, including ones after business hours, to complete the onboarding process. Notwithstanding any anxiety Dillard may have felt to immediately complete the onboarding process, these emails did not excuse Dillard from her duty to read and understand the agreements before signing them.

Indeed, the Sixth Circuit recently rejected a like argument that an employer's effort to hasten an employee's completion of onboarding documents was a "fair excuse" for the employee's failure to understand the arbitration agreement he signed. *See Gavette*, 2025 WL 318224, at *3. The *Gavette* court determined that the defendant-employer's request that the

plaintiff-employee "return all onboarding documents 'as soon as possible' so that he could start orientation…merely convey[ed] a sentiment of urgency for commencing Gavette's employment." *Id*. This spur to complete the onboarding documents, without an affirmative rush to sign, such as refusing a request for additional time or a threat to his job if he did not sign immediately, did not excuse Gavette from his duty to understand the terms of the agreement before signing it. *See id*.

Likewise, here, Founders merely expressed the urgency of completing the onboarding process so Dillard could be added to the payroll system for her first day. *See* ECF No. 36-6, PageID.1177. Indeed, when Dillard lamented that she continued to have issues with the onboarding process using her phone and that she would not have access to a computer until the next day, Geyer responded, "No problem at all. Let me know as soon as it is completed." *Id*. He did not refuse her tacit request for additional time by insisting she complete the process that night, nor did he suggest that any delay in completing the onboarding process would jeopardize her job. *See id*. Like the defendant employer's nudge to complete the onboarding documents in *Gavette*, Founders' benign response to Dillard's difficulties in completing the onboarding process did

not excuse her from her duty to read and understand the agreements she signed, including the one containing the arbitration agreement. *See id*.

In sum, Dillard electronically signed the Confidentiality Agreement, which contained the arbitration agreement. Under Michigan contract law, Dillard is presumed to have read and understood the terms of the agreement she signed and her failure to have done so does not preclude the existence of mutual assent to the arbitration agreement or otherwise invalidate the agreement.

## IV. Conclusion

Founders has carried its burden of proof that the parties executed a valid arbitration agreement. Under 9 U.S.C. § 4, Dillard must arbitrate her claims against Founders. The Court thus **GRANTS** Founders' motion to compel arbitration (ECF No. 18) and **STAYS** this case pending that arbitration.

**IT IS SO ORDERED.**

s/Shalina D. Kumar
SHALINA D. KUMAR
United States District Judge

Dated: February 12, 2025